1

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8

9   JEANETTE ROGERS,                        Case No. 06-cv-01258 TAG

10              Plaintiff,                   MEMORANDUM OPINION AND ORDER
                                             ON PLAINTIFF'S APPEAL FROM
11                                           ADMINISTRATIVE DECISION
        vs.
12                                           ORDER DIRECTING THE CLERK TO
                                             ENTER JUDGMENT FOR DEFENDANT
13  MICHAEL J. ASTRUE,[1]                    AND AGAINST PLAINTIFF AND TO
    Commissioner of Social Security,         CLOSE THIS MATTER
14
                Defendant.
15  _____/

16          Plaintiff Jeanette Rogers ("Claimant" or "Plaintiff"), through her attorney, seeks judicial

17  review of an administrative decision denying her claim for Supplemental Security Income ("SSI")

18  under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § 1381 et seq.  Pending before the

19  Court is Plaintiff's appeal from the administrative decision of the Commissioner of Social Security

20  ("Commissioner").  Plaintiff filed her complaint on September 11, 2006, and her opening brief on

21  June 8, 2007.[2]  (Docs. 1, 14).  The Commissioner filed his opposition brief on July 10, 2007.  (Doc.

22  15).  On July 25, 2007, Plaintiff filed her reply to the Commissioner's response.  (Doc. 16).

23          Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties consented

24

25          [1] Michael J. Astrue is substituted for his predecessor, Jo Anne B. Barnhart, as Commissioner of the Social
    Security Administration. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

26          [2] Plaintiff refers to her opening brief as a motion for summary judgment, (Doc. 19), and her reply brief as a
    response to the Commissioner's cross-motion for summary judgment.  (Doc. 23).  Although briefs filed in Social Security
27  cases previously were deemed summary judgment motions, for several years this Court has termed the documents as
    "opening briefs," "responses" or "oppositions," and, "reply briefs."  This memorandum opinion and order continues the
28  more recent trend.

                                            1

to proceed before a United States Magistrate Judge, and, by an order dated March 14, 2007, this action was assigned to the United States Magistrate Judge for all further proceedings.  (Doc. 13).

## JURISDICTION

On March 14, 2001, Claimant protectively filed her SSI application, alleging an onset date of March 4, 2001.  (Administrative Record ("AR" 79).  On April 2, 2001, Claimant's SSI application, signed and dated March 29, 2001, was filed.  (AR 80-82).  Her application was denied initially and on reconsideration.  (AR 47-58, 59-63, 64-67, 69-73).

After timely requesting a hearing, Claimant, her counsel, and Charlene Burns, a witness on Claimant's behalf, appeared before Administrative Law Judge ("ALJ") James E. Ross on April 10, 2003.  (AR 74, 504-538).  The ALJ issued a written decision finding that Claimant was not disabled for purposes of SSI on May 30, 2003.  (AR 390-400).  On April 6, 2004, the Appeals Council granted Claimant's request for review and remanded the case to the ALJ.  (AR 401, 408).  In its order, the Appeals Council directed the ALJ to hold a new hearing in which he was to, inter alia, question the Claimant regarding her past relevant work, include the testimony of a Vocational Expert ("VE"), and properly apply the procedures outlined in 20 C.F.R. § 416.920a(c) (mental impairments) and 20 C.F.R. § 416.913(d) (lay witness testimony).  (AR 409-411).

Claimant, her attorney, and VE Thomas Dachelet appeared before ALJ Ross for the remanded hearing on December 9, 2004.  (AR 539-570).  On July 21, 2005, ALJ Ross held a supplemental hearing that was restricted to the testimony of VE Dachelet.  (AR 571-589, see AR 19).  On August 22, 2005, the ALJ issued his written decision, in which he again denied Claimant's application for SSI.  (AR 16-25).  The Appeals Council denied Claimant's request for review on July 12, 2006.  (AR 8-10).  The Appeals Council's decision, therefore, became the final decision of the Commissioner, which is appealable to the district court pursuant to 42 U.S.C. § 405(g).  The initiation of an appeal in the district court must be commenced within sixty (60) days of the Appeal Council's decision.  Id.  On September 11, 2006, Claimant timely filed this action.  (Doc. 1).

## STATEMENT OF FACTS

The facts have been presented in the administrative hearing transcripts, the ALJ's decisions, and the briefs filed by Claimant and the Commissioner, and, therefore, only will be summarized

1   here.  In her 2001 protective filing, Claimant reported that she was born on October 10, 1958.  (AR
2   79).

3   April 10, 2003 Hearing

4       During the April 10, 2003 hearing, Claimant testified that she was 44 years old and had
5   completed one-and-one-half years of college.  (AR 508).  ALJ Ross took judicial notice of a March
6   28, 1997, decision in which the ALJ concluded that, although Claimant suffered from a severe
7   impairment involving her cervical lumbar spine, she was capable of performing light work, including
8   her past work as a cashier and a group home counselor.[3]  (AR 509).  After the 1997 decision,
9   Claimant worked with people who suffered from autism, Alzheimer's, and schizophrenia until she
10  was involved in a car accident on March 4, 2001.  (Id., AR 518-519).

11      Claimant testified that the accident resulted in her suffering lower back pain and some
12  numbness that radiated down her legs to her feet.  (AR 510).  She added that she had to wear a neck
13  collar for approximately two months, and that she generally is in pain.  (Id.).  Claimant reported that
14  her former treating physician, Dr. Graham, diagnosed her with fibromyalgia, and an emergency room
15  doctor recently suggested that she might have lupus.  (AR 511, 522-523).  When questioned about
16  her pain and related problems, Claimant responded that she suffers sharp pains in her right eye, left
17  jaw, neck, shoulders, back, hips and down the outer side of her legs to her heels, which become
18  numb.  (AR 512-513).  Claimant added that her elbows and fingers, especially in her right hand, hurt
19  to the extent that she sometimes cannot dress or wash herself.  (AR 513).  Claimant further testified
20  that the level of pain she suffers varies from day-to-day and ranges between light and  unbearable.
21  (AR 519-520).  In addition, Claimant stated that she suffers from depression, for which she takes
22  Prozac and Paxil.  (AR 516-17).  Claimant testified that she saw a therapist at the California School
23  of Psychology, every week.  (AR 526).

24  ///

25

26      [3]  The 1997 decision denying Claimant's previous application for disability benefits was not adjudicated and,
    therefore, resulted in a presumption of continuing nondisability unless Claimant rebutted this presumption through the
27  presentation of changed circumstances.  Chavez v.Bowen, 844 F.2d 691 (9th Cir. 1988).  ALJ Ross concluded that
    Claimant's introduction of impairments that were not considered in her previous decision constituted changed
28  circumstances.  (AR 393).

Claimant reported that she received steroid injections in her back, neck, or head while being treated by Dr. Sing – a pain management doctor – from 2001 to 2002. (AR 514, 525). She testified that she takes pain medication, including Celebrex and Vicodin, but often goes to the hospital because, even with the prescribed medications, the pain becomes intolerable. (AR 514, 516, 523). The hospital treats her with morphine or Demerol. (Id.).

With respect to her exertional abilities and daily activities, other than the difficulties with dressing and washing herself previously referenced, Claimant testified that sometimes she can sit for only 30 minutes. (AR 514). Claimant added that she can stand for a maximum of 5 minutes, and walk for 1/4 of a block before she starts feeling numb and has other sensations that make her afraid to walk alone. (AR 515). She testified that she possibly could lift ten pounds, but not on a frequent basis. (AR 520). As to her cognitive functions, Claimant reported that she cannot focus or concentrate because of her pain, especially during that part of each day when it is severe. (AR 521). Claimant further complained that her chronic fatigue requires her to lie down on the days that she feels able to go outside. (AR 515-516). Claimant added that she avoids people when she feels depressed and, since the 2001 car accident, she has spent most of the time at home. (AR 517). With respect to the household chores, Claimant stated that, because of the pain, she can do only some light dusting, and her mother and sons do the remaining housework. (AR 518-519).

Charlene Burns next testified that she has been a friend of Claimant's for 20 years and sees her every day. (AR 528). Ms. Burns explained that she tries to comb Claimant's hair, but it causes Claimant too much pain, and she has observed that Claimant suffers a great deal of pain that prevents her from sitting straight or writing because her hand cramps up. (AR 528-529). Ms. Burns further testified that Claimant, who had been physically activity, could not engage in any of the physical activities that she previously enjoyed since the car accident. (AR 529, 531). Further, Claimant has become isolated due to her depression. (AR 529-530). In addition, Ms. Burns stated that Claimant used to be a "giver" and a "helper" and, because of the accident, she no longer is able to act in those capacities, which frustrates Claimant. (AR 530-531).

///

///

4

December 9, 2004 Hearing

Pursuant to the Appeal Council's remand order, an administrative hearing was held before ALJ Ross during which VE Dachelet testified regarding the nature of Claimant's past relevant work and her ability to work.  (See AR 408-411, 547-570).  The VE classified the three jobs Claimant held from 1991 through September 1999 as skilled work that, according to the  Dictionary of Occupational Titles ("DOT"), was in the light exertional category, but, if performed the way Claimant described them, they would move into a medium category.  (AR 547-548; see AR 116-119).  These jobs were identified as a group home counselor and two positions as a residential/client supervisor.  (AR 116).  VE Dachelet further testified that he would classify Claimant's one year job as a driver as a light, semi-skilled position based on her description of the duties involved.  (AR 548-549; see AR 116, 120).  In her work history report, Claimant also included a position as a program facilitator, which, based on her job description, the VE determined fell into the light-to-medium, skilled position that involved dealing with people, similar to the first three jobs positions.  (AR 549; see AR 116, 121).

The ALJ requested that the VE assume that Claimant could perform the full range of light work, i.e., lifting and carrying 20 pounds occasionally and 10 pounds frequently and sitting, standing, or walking six out of eight hours.  (AR 550-551).  ALJ Ross added that Claimant would be restricted to simple repetitive tasks and very little interaction with the public.  (AR 551).  Asked whether Claimant would be able to perform any of her past relevant work given this scenario, VE Dachelet opined that the limitation on interacting with others would preclude Claimant from doing any of her past jobs as she described them.  (AR 551-552).  The VE added that driving, which involved getting from point A to point B and maintaining records, constituted Claimant's only transferrable skill.  (AR 550).

The ALJ questioned whether there were jobs that Claimant could perform and, if so, what they were and the number(s) available in California.  (AR 552).  The VE responded that there was an identifiable group of light and sedentary jobs entitled "material moving workings," which included a variety of jobs in different industries, and there were 235 people presently employed in the light exertional category.  (Id.).  The VE provided, as examples of the light jobs, dumping machine

1   operators, bucket operators, and rail tractor operators.  (AR 552-553).  VE Dachelet observed that the

2   low number of employees rendered that category fairly irrelevant, and identified a second category

3   that included hand packers and packagers, which employed over 30,000 individuals at the light level.

4   (AR 553).  The VE added that there were 1,876 individuals employed at the sedentary end of this

5   category.  (Id.).  The VE next identified a third broad category – "laborers and freight, stock and

6   material movers, hand" – from which he selected a job involving production workers, including

7   semiconductor processors.  (AR 554).  He testified that there were 32,785 jobs at the light, unskilled

8   level, and 5,246 at the sedentary level.  (Id.).  VE Dachelet further testified that multiplying the

9   reported jobs by ten would quickly provide the number available in the national economy, although a

10  multiplication factor of twelve would be more accurate.  (Id.).

11          Because the VE could not provide the DOT classifications for identified categories of jobs

12  that were available in the national economy that Claimant could perform such that Claimant's

13  attorney could cross-examine him during this hearing, the VE agreed to forward her a list of DOT

14  jobs.  (AR 565).  The ALJ then would hold a supplemental hearing at the attorney's request.  (Id.).

15  July 21, 2005 Supplemental Hearing

16          Claimant and her attorney appeared before ALJ Ross to further question VE Dachelet as

17  agreed upon at the December 2004 hearing.  (See AR 565, 573).  The VE testified that the listing of

18  work requirements under the DOT's classification of "packaging occupations" consisted of a general

19  description of tasks that a job under that title might entail.  (AR 577-578).  VE Dachelet reiterated

20  that, regardless of the DOT classification, the specific job titles that he mentioned during the

21  December 2004 hearing were those that Claimant was capable of performing in that the work was

22  "light, simple, and nonpublic."  (AR 578).  The VE responded to multiple questions from Claimant's

23  attorney regarding the aforesaid jobs, including whether some of the jobs were seasonal and/or part-

24  time.  (AR 579-582).  VE Dachelet speculated that some jobs would be seasonal, but stated that he

25  did not know about the availability of part-time work.  (Id.).  He further testified that the jobs in the

26  production category involved repetitive physical movement at a specific pace.  (AR 580, 582).

27          Claimant's attorney presented several hypothetical questions to the VE as to whether an

28  individual with either more severe exertional or postural limitations, or decreased abilities to

6

concentrate and pay attention at work than in the ALJ's hypothetical would be able to do the jobs that the VE previously stated Claimant could perform.  (AR 583-587).  Depending on the type and extent of the restriction, VE Dachelet testified that the hypothetical individual still could perform the work, could do the work at a sedentary level, or would not be able to work at all.  (Id.).

## RELEVANT LEGAL FRAMEWORK

To qualify as disabled under Title XVI of the Act, an applicant for SSI benefits must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Act also provides that a claimant shall be determined to be under a disability only if his impairments are of such severity that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

## STANDARD OF REVIEW

Congress has provided a limited scope of judicial review of a Commissioner's decision.  See 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ, when it is supported by substantial evidence and is free from legal error.  See Ukolov v. Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005)(quotations and citations omitted); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985); 42 U.S.C. § 405(g).  Substantial evidence is more than a mere scintilla, Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance.  McAllister v. Sullivan, 888 F.2d 599, 601-602 (9th Cir. 1989); Desrosiers v. Secretary of Health and Human Serv., 846 F.2d 573, 576 (9th Cir. 1988).  Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (citations omitted).  "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld.  Mark v. Celebrezze, 348 F.2d 289, 293 (9th Cir. 1965).  On review, the court considers the record as a whole, not just the evidence supporting the decision of the Commissioner.  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989)

///

1  (citations omitted).  See Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007) (summarizing standard of

2  review in Social Security cases).

3      It is the role of the trier of fact, not the court, to resolve conflicts in evidence.  Richardson,

4  402 U.S. at 400.  If the evidence supports more than one rational interpretation, the court must

5  uphold the decision of the ALJ.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  Moreover, if

6  there is substantial evidence to support the administrative findings, or if there is conflicting evidence

7  that would support a finding of either disability or non-disability, the Commissioner's decision is

8  conclusive.  Sprague v. Bowen, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  Nevertheless, a decision

9  supported by substantial evidence will be set aside if the proper legal standards were not applied in

10  weighing the evidence and making the decision.  Brawner v. Secretary of Health and Human Serv.,

11  839 F.2d 432, 433 (9th Cir. 1987).

12  **SEQUENTIAL EVALUATION PROCESS**

13      The Commissioner has established a five-step sequential evaluation process for determining

14  whether a person is disabled under Title XVI of the Act.  20 C.F.R. § 416.920.  Step one determines

15  whether the claimant is engaged in substantial gainful activities.  If he is, benefits are denied.

16  20 C.F.R. § 416.920(a)(4)(i), (b).  If he is not, the decision maker proceeds to step two, which

17  determines whether the claimant has a medically severe impairment or combination of impairments

18  that meet the duration requirements set forth in 20 C.F.R. § 416.909; i.e. the impairment(s) are

19  expected to result in death, or have continuously lasted or are expected to last at least twelve months.

20  20 C.F.R. § 416.920(a)(4)(ii), (c).  If the claimant does not have a severe impairment, a combination

21  of impairments, or meet the duration requirement, the disability claim is denied.  Id.

22      If the impairment is severe, the evaluation proceeds to the third step, which compares the

23  claimant's impairment with a number of listed impairments acknowledged by the Commissioner to

24  be so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 416.920(a)(4)(iii), (d);  20

25  C.F.R. Pt. 404 Subpt. P App. 1.  If the impairment meets or equals one of the listed impairments and

26  satisfies the duration requirement, the claimant is conclusively presumed to be disabled.

27  20 C.F.R. §§ 416.909, 416.920(a)(4)(iii), (d).  If the impairment is not one conclusively presumed to

28  be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment

8

prevents the claimant from doing work performed in the past. If the claimant is able to perform his

previous work, he is not disabled.  20 C.F.R. §§ 416.920(a)(4)(iv), (e); 416.960(b).  If the claimant

cannot perform this work, the fifth and final step in the process determines whether he is able to

perform other work in the national economy in view of his age, education and work experience.  20

C.F.R. §§ 416.920(a)(4)(v), (f) and (g); 416.960(b) and (c).  See Bowen v. Yuckert, 482 U.S. 137,

107 S. Ct. 2287 (1987).

The initial burden of proof rests upon a claimant to establish that he "is entitled to the

benefits claimed under the Act."  Rhinehart v. Finch, 438 F.2d 920, 921 (9th Cir. 1971)(citations

omitted).  In terms of the five step sequential evaluation process, the Ninth Circuit has held that

"[t]he burden of proof is on the claimant as to steps one to four," while at the same time noting that

an ALJ's *affirmative duty* to assist a claimant to develop the record . . . complicates the allocation of

burdens" such that "the ALJ shares the burden at each step."  Tackett v. Apfel, 180 F.3d 1094, 1098

& n.3 (9th Cir. 1999)(italics in original).  The initial burden is met once a claimant establishes that a

physical or mental impairment prevents him from engaging in his previous occupation.  The burden

then shifts to the Commissioner to show (1) that the claimant can perform other substantial gainful

activity and (2) that a "significant number of jobs exist in the national economy" which claimant can

perform.  Kail v. Heckler, 722 F.2d 1496, 1498 (9th Cir. 1984).

### ALJ'S FINDINGS

ALJ Ross found, at step one, that Claimant had not engaged in substantial gainful activity

since she protectively filed for SSI on March 14, 2001.  (AR 19, 24).  At step two, the ALJ found

that Claimant suffered from a history of generalized body pain, etiology unknown, but which could

be the result of chronic strain of the cervical and lumbosacral spine, depression, and anxiety.  (AR

20, 24).  At step three, the ALJ found that Claimant did not have an impairments or combination of

impairments that met or medically equaled those listed in Appendix 1, Subpart P, Regulation No. 4.

(AR 20, 24).

The ALJ then discussed in detail Claimant's medical and other record evidence and her

testimony, incorporating the evidence and rationale he set forth in his 2003 decision to the extent it

had not been modified.  (AR 20-23; see AR 394-97).  Based on the various medical records,

Claimant's work history and education, the testimony of Charlene Burns, and Claimant's allegations of pain and limitations, which the ALJ did not find credible, ALJ Ross concluded that Claimant retained the residual functional capacity ("RFC") to perform light exertional work restricted to simple, repetitive tasks involving little interaction with the public.  (Id., AR 24).

At step four, the ALJ found that Claimant was able to perform her past relevant work as a driver and, thus, was not disabled.  (AR 23, 24).  Alternatively, the ALJ found, based on the VE's testimony, that there were a significant number of jobs available in the national economy that Claimant could perform.  (AR 23-24, 25).  Accordingly, ALJ Ross concluded that Claimant was not disabled and, therefore, not entitled to SSI payments.  (AR 25).

## ISSUES

Claimant contends that the Commissioner erred because ALJ Ross ignored substantial evidence and misapplied the law.  Specifically, Claimant argues that:

(I)  The ALJ erroneously rejected the opinions of Claimant's treating physicians and psychologists without providing adequate reasons for doing so;

(II)  The ALJ improperly found Claimant's pain testimony not credible; and

(III)  The ALJ failed to fully develop the record in that he

    A.  Did not order a rheumatology consult; and

    B.  Refused to permit Claimant to testify as ordered by the Appeals Council.

As discussed above, this Court must uphold the Commissioner's determination that a claimant is not disabled if the Commissioner applied the proper legal standards and there is substantial evidence in the record as a whole to support the decision.

## DISCUSSION

### I.   Failure to Adopt Opinion of Treating Physicians and Psychologists

In her opening brief, Claimant asserts that the ALJ erroneously affords greater weight to the report of examining consultant Rustom F. Damania, M.D., than to the opinion of treating physician, Dr. Ajit Singh Khaira.  (Doc. 14, pp. 14, 16).  Claimant adds that the ALJ neglected to meet his legal obligation to set forth "specific and legitimate" reasons, supported by substantial evidence, for rejecting a treating physician's opinion.  (Id. at 16-17).  Accordingly, Claimant contends that, given

that his explanation of her significant physical and mental limitations are not controverted by any substantial evidence and, even if there were such evidence, the opinion of a treating physician is entitled to greater weight than that of nonexamining or nontreating physicians, Dr. Khaira's opinion should be dispositive, citing 20 C.F.R. § 416.927(d)(2) and Social Security Ruling ("SSR") 96-2. (Id. at 16-18).  Claimant further notes that the ALJ dismissed the diagnosis that she suffered from fibromyalgia based on medical criteria and symptoms from sources that the ALJ did not cite.  (Id. at 15-16).  Finally, Claimant avers that she was examined by Dr. Robert Graham several times, and, because his conclusions regarding her limitations were similar to those of Dr. Khaira's, the ALJ should have based his decision on the opinion of Dr. Khaira.  (Id. at 19).

Claimant raises essentially the same arguments as above with respect to the ALJ's reliance on the report of consulting psychiatrist Burke J. Bonilla over the opinions of her treating psychologists. (Doc. 14, pp. 19-20).  As she asserts with respect to her medical physicians, Claimant contends that the reports of her long-term treating psychologists were due more weight than the opinion of a one-time consultant.[4]  (Id. at 20).

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant.  Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.1998); Lester v. Chater, 81 F.3d 821, 830 (9th Cir.1995).  Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record.  Id. at 830.  Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record.  Id. (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983)).  This can be done by the ALJ setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.1989).  The ALJ must do more than offer his conclusions.  The

---

[4] Claimant  does not claim that ALJ Ross failed to evaluate her mental impairments in accordance with 20 C.F.R. § 416.920(a), as the Appeals Council directed in its remand order.  (AR 410; Doc. 14).  Accordingly, whether the ALJ properly assessed Claimant 's emotional ailments is not discussed herein in detail.  See Bergfeld v. Barnhart, 361 F. Supp. 2d 1102, 1110 (D. Ariz. 2005)("[a] reviewing federal court will only address the issues raised by the claimant in his appeal from the ALJ's decision").

ALJ must set forth his own interpretations and explain why they, rather than the doctor's, are correct. Embrey v. Bowen, 849 F.2d 418, 421-422 (9th Cir.1988).

Courts within the Ninth Circuit have recognized various reasons deemed sufficient for the ALJ to disregard a treating physician's opinion.  These reasons include: conflicting medical evidence, the absence of regular medical treatment during the alleged period of disability, and the lack of medical support for physicians' reports that are based substantially on the claimant's subjective complaints of pain.  Flaten v. Secretary of Health & Human Serv., 44 F.3d 1453, 1463-1464 (9th Cir. 1995); Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1998).  The ALJ also may disregard a physician's opinion that is brief, conclusory, and unsupported by clinical findings.  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir.2001); Magallanes, 881 F.2d at 751.

In Orn v. Astrue, 495 F.3d 625 (9th Cir. 2007), the Ninth Circuit reiterated and expounded upon its position regarding the ALJ's acceptance of the opinion of an examining physician over that of a treating physician.  "When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not substantial evidence.  Orn, 495 F.3d at 632 (citation and quotation omitted).  "By contrast, when an examining physician provides independent clinical findings that differ from the findings of the treating physician, such findings are substantial evidence."  Id. (citation omitted).  "Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and are supported by substantial evidence . . . or (2) findings based on objective medical tests that the treating physician has not herself considered."  Id. (citations omitted).

Treating Physicians and Consultants

In the instant case, Dr. Khaira treated Claimant briefly before her motor vehicle accident ("MVA"), and, after her MVA, from 2001 through June 2005 he treated Claimant for both her physical and psychological problems.  (See AR 188-189, 283-99, 486-503).  Dr. Khaira's records indicate that Claimant complained of spasms, cramping in both hands, and leg, hip, back, and neck pain.  (See id.).  Claimant also presented with transient ailments and insomnia.  (See, e.g., 283-285, 291, 463, 495-97).  To alleviate Claimant's pain and related symptoms, Dr. Khaira referred Claimant to physical therapy, prescribed medications, and treated her with at least one epidural injection,

which she stated provided relief.  (See, e.g., 283, 287, 293-295, 467).  Dr. Khaira noted that Claimant was seen by a pain specialist, but no records from treatment by a pain management specialist or physical therapists, per his referral, are included in the administrative record. (AR 501; see generally AR).  Dr. Khaira also prescribed psychotropic medications for Claimant's depression and anxiety.  (See, e.g., 283, 287, 295, 299, 463, 502).  Dr. Khaira's progress notes reveal that Claimant reported on several occasions that she felt better.  (See 294, 296).  He also mentions fibromyalgia syndrome and fibromyalgia in his treatment records several times.  (See 296-298, 500).

Records from St. Agnes Medical Center reveal that Claimant went to the emergency room seven times between July 2002 and April 2003 complaining of severe pain and headaches resulting from her MVA, her fibromyalgia, or both.  (AR 307-363).  The emergency room physician injected Claimant with morphine, Demerol, or a similar medication and, on occasion, gave Claimant a written prescription for the same pain medicine that she received from Dr. Khaira.  (Id.).  Dr. Khaira reported that Claimant went to the emergency room for treatment of her pain twice in the two weeks ending on or about May 10, 2005.  (AR 488).

Dr. Khaira submitted a "to whom it may concern" opinion letter dated December 2, 2004 together with a physical residual functional capacity ("RFC") questionnaire.  (AR 458-462).  Dr. Khaira reported that he started treating Claimant soon after her March 4, 2001, MVA, which accident continues to cause her neck and back pain, headaches, depression, and fibromyalgia syndrome.  (AR 458).  Dr. Khaira stated that he has not been able to find a rheumatologist who would accept Claimant's insurance and, therefore, she has not undergone further testing for her fibromyalgia.  (Id.).  Dr. Khaira noted that Claimant always appears to be in pain, which  medication helps but does not resolve.  (Id.).  He added that she has a sad affect and, in August 2002,  he referred her for counseling to the Alliant University California School of Professional Psychology ("CSPP") for help with her depression.  (Id.).  Dr. Khaira further stated that he prescribes her psychotropic medication.  (Id.).  He opined that Claimant could not work at present as she was not able to walk one block, sit still for more than 20 minutes, stand for 15 minutes, or stoop or crouch. (Id.).  Dr. Khaira further reported that Claimant would not be able to sit, stand, or walk for a total of two hours in an eight-hour work day.  (Id.).  Dr. Khaira's responses to the RFC questionnaire

13

generally reflect the assessment in his letter, with certain additions including the necessity that Claimant take frequent unscheduled breaks throughout the workday, use a cane, and, in response to specific questions regarding her limitations, that Claimant could frequently lift less than 10 pounds and occasionally lift 20 pounds.  (AR 459-462).

Dr. Robert A. Graham also treated Claimant briefly and submitted two "to whom it may concern" letters, dated January 10, 2002, and April 4, 2003.  (AR 244, 300).  Dr. Graham's two opinion letters evidently were based on Claimant's three appointments with him between January 10, 2002, and April 9, 2003.  (AR 244-246, 300-305).  Dr. Graham's cursory treatment notes indicate that Claimant suffered from myalgia and/or fibromyalgia.  (AR 245, 301, 303, 304).  In his two report letters, Dr. Graham stated that Claimant suffered from post-traumatic pain syndrome and fibromyalgia, and opined that she was totally and permanently disabled.  (AR 244, 300).

Examining consultant Rustom F. Damania, M.D., submitted a report based on a review of the then-available records and his June 3, 2002, physical examination of Claimant.  (AR 247-252). Dr. Damania noted that Claimant had been suffering two of her chief complaints – neck and low back pain – since 1992, but that the pain had become worse since her March 2001 MVA.  (AR 247). Claimant's third "chief" complaint included insomnia and jumpiness since the accident.  (Id.).  Dr. Damania reported that all of Claimant's diagnostic tests were negative, and that she received injections from a pain management doctor.  (Id.; AR 250).  During the physical examination, Claimant refused to comply fully with the range of motion ("ROM") test of her cervical spine, but Dr. Damania noted that her spine was tender at the base, her right and left rotations were close to normal, and her upper extremities were normal.  (AR 249).  In addition, Claimant's thoracic spine was normal, but her ROM on extension and forward flexion in her lumbosacral spine was limited, possibly because she complained about the pain and refused to move further than she did.  (Id.). Claimant was able to walk normally but refused to walk on her toes and heels or squat.  (AR 250).

Dr. Damania's assessment was that Claimant's chronic neck and low back pain were exacerbated by the March 4, 2001, MVA, but there was no clinical or radiological evidence of radiculopathy.  (Id.).  Further, he found that Claimant could "sit, stand, walk, move about, carry and handle objects, hear, speak, and travel."  (Id.).  Dr. Damania concluded that Claimant was not limited

as to bending, stooping, or crouching, and had no manipulative limitations.  (Id.).  In response to a questionnaire, Dr. Damania stated that Claimant's ROM, gait, and mental status were "good."  (AR 252).

With respect to Claimant's physical impairments and abilities, the ALJ relied, in part, on Dr. Damania's report, as well as on the lack of medical and diagnostic records evidencing that she suffered disabling pain and/or fibromyalgia and on Claimant's reported daily activities, which he discussed in detail.  (AR 20, 394-396, 397-398).  The ALJ explained that he gave "great weight" to Dr. Damania's detailed opinion because it was based on his thorough examination of Claimant.  (AR 398).  ALJ Ross gave less weight to Dr. Khaira's opinions because his records reflected treatment based on Claimant's subjective complaints of pain,[5] he diagnosed fibromyalgia without performing any tests for the common symptoms, such as tender points,[6] or altering her prescription pain medication (Vicodin) until he subsequently added Celebrex, and there was no clinical or diagnostic evidence that supported Dr. Khaira's imposed limitations, all of which constitute adequate reasons for discounting the treating physician's opinion.  (AR 20-21, 398); see Fair, 885 at 604 (subjective complaints of severe pain); Tonapetyan, 242 F.3d at 1149; Magallanes, 881 F.2d at 751(brief, conclusory opinion unsupported by clinical findings).  ALJ Ross also deemed Dr. Khaira's opinion less than credible due to Claimant's similar allegations of pain in her previous  application for disability benefits and her ability to return to work when that application was denied.  (AR 398).

The Court is mindful of the recent decision in Orn v. Astrue, 495 F.3d 625 (9th Cir. 2007), where the Ninth Circuit reiterated the deference that should be given to a treating physician.  However, where the treating physician's opinion is not supported by the medical records in the first instance, as here, Orn is not instructive.

///

---

[5]  This section excludes Dr. Khaira's treatment of Claimant's mental ailments.

[6]  Claimant  argues that the ALJ failed to cite the source for his criteria for fibromyalgia, such as tender points. (Doc. 14, p. 15).  Despite Claimant 's references to court cases noting that fibromyalgia is a subjective impairment that is disabling, medical books and websites note that one of the main symptoms of fibromyalgia is the presence of multiple tender points; i.e., pain  when slight pressure is applied on parts of the body.  See Stedman's Medical Dictionary 725-26 (28th ed. 2006); American Medical Ass'n, Concise Medical Encyclopedia 285-86 (Martin S. Lipsky, M.D., ed, 2006); http://www.mayoclinic.com/health/fibromyalgia (visited March 20, 2008).

1   <u>Treating Mental Health Experts and Consulting Psychiatrist</u>

2       Regarding Claimant's mental health treatment, the record does not include progress reports

3   from her therapy sessions at the CSPP, but there are reports, summaries, and evaluations prepared by

4   her treating providers.  (<u>See</u> AR 364-370, 472-485).  The CSPP records include an August 28, 2002,

5   intake evaluation conducted by a psychological intern, which Gregory Cherney, Ph.D., a licensed

6   clinical supervisor, countersigned.  (AR 367-370).  After summarizing Claimant's relevant history

7   and current situation, which included a prior hospitalization for mental health treatment and the

8   death of her fiancé a few months after her MVA, the intern concluded that Claimant suffered from a

9   panic disorder with agoraphobia, depressive disorder not otherwise specified ("nos"), and determined

10  it necessary to rule out marijuana and alcohol abuse, a medically based mood disorder or personality

11  change, and a personality disorder nos.  (<u>Id.</u>).  Noting that Claimant had suffered excessive physical

12  and emotional trauma, causing anxiety, depression, and functional limitations, the intern believed

13  that ongoing, long-term individual psychotherapy with cognitive behavioral strategies, and medical

14  monitoring by her treating physician, was called for.  (AR 369-370).

15      In a May 1, 2003 treatment summary prepared at the request of Claimant's attorney,

16  psychological intern Cynthia Hirbour MA reported that Claimant experienced "chronic somatic

17  pain" since March 2002.  (AR 364).  Ms. Hirbour reported that Claimant regularly attended her

18  weekly sessions, often complaining of her pain, for which these was no medical justification.  (<u>Id.</u>).

19  The intern noted that Claimant recently had started discussing some of her problems.  (AR 365).

20  Ms. Hirbour's diagnosis included pain disorder associated with psychological factors and general

21  medical condition, with a note to rule out fibromyalgia, depressive disorder nos, and panic disorder

22  without agoraphobia.  (<u>Id.</u>).  She recommended that Claimant undergo a psychological disability

23  evaluation to help with her SSI application, and noted that Claimant should continue long-term

24  individual psychotherapy to help her deal with her emotional and physical problems.  (<u>Id.</u>).

25  Dr. Cherney also countersigned this evaluation.  (AR 366).

26      An updated psychological evaluation was performed on November 22, 2004, also at the request

27  of Claimant's attorney.  (AR 472).  Psychological trainee Susana Castellanos, M.A. performed the

28  examination and prepared a report and assessed Claimant's nonexertional limitations, for which she

submitted an addenda on December 6, 2004.  (AR 472-77, 478-80).  Both reports were countersigned

by Supervising Clinical Psychologist Thomas W. Shaffer, Ph.D.  (AR 477, 478).   In the November

22, 2004, evaluation, Ms. Castellanos administered several psychological tests, including the

Rorschach Inkblot Test, the Wechsler Adult Intelligence Scale ("WAIS-III"), and the Personality

Assessment Inventory ("PAI").  (AR 472).  Claimant also was interviewed, during which she

reiterated her history, physical problems, and living situation.  (AR 472-74).  Ms. Castellanos

observed that Claimant was well-oriented and cooperative, but did not appear motivated when taking

the tests. (AR 474).  With respect to the test results, Ms. Castellanos invalidated the PAI after

concluding that Claimant provided atypical and exaggerated answers.  (Id.).  The WAIS-III indicated

that Claimant's overall IQ was 65, with a performance IQ of 74, and a verbal IQ of 63.  (AR 474-75).

She found that Claimant was in control of herself but had problems responding to emotions and

tended to internalize expressions.  (AR 475).  Claimant self-reported severe depression and its

concomitant effects.  (AR 475-476).  The test results in conjunction with the clinical examination led

Ms. Castellanos to agree with Dr. Burke Bonilla's diagnosis of major depressive disorder, recurrent,

with psychotic features such as hearing voices.  (AR 476).  She recommended that Claimant continue

with individual psychotherapy and that she undergo an evaluation by a psychiatrist.  (AR 477).  In

the December 6, 2004, addendum, Ms. Castellanos summarized Claimant's (1) understanding and

memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation as it

relates to Claimant's "Mental Residual Functional Capacity Assessment."  (AR 478).  She then

completed a mental RFC assessment form, in which she checks as moderate or marked Claimant's

ability to understand and remember instructions, carry out instructions and work-related activities,

interact appropriately, and adapt to changes in the work place.  (AR 479-480).  Ms. Castellanos

indicates that Claimant has only moderate limitations with respect to understanding, remembering,

carrying out, and performing simple (less than 3-step) instructions, but that she has marked

difficulties in social interactions.  (Id.).

Claimant's new treating psychological trainee prepared a December 7, 2004, "to whom it may

concern" letter, which Dr. Cherney cosigned, stating that Claimant was in therapy since August

2002, and had attended a total of 44 sessions to date.  (AR 481).

On October 10, 2001, Claimant saw psychiatrist Burke J. Bonilla, M.D. for a consultation. (AR 201-204). Claimant complained that she became severely depressed since her March 2001 MVA and suffers a variety of problems related to the accident, including chronic pain, insomnia, forgetfulness, nightmares, and difficulty concentrating. (AR 201). Claimant added that she hears voices and senses noise, which scares her, and that she is afraid of becoming involved in another car accident. (Id.). According to Claimant, her primary care physician prescribed Zyprexa and Paxil for her emotional problems, and Vicodin to alleviate her pain. (Id.). Dr. Bonilla's report further notes that Claimant lives with her teenage son, that her activities of daily living include watching television, doing some household chores and shopping but not preparing meals, driving to a limited extent, but Claimant engages in no pleasurable activities or hobbies. (AR 202).

After performing a mental status examination, Dr. Bonilla diagnosed Claimant with severe major depressive disorder with psychotic features. (AR 202-203). In her consultative report, the doctor indicated that it was important to rule out post-traumatic stress disorder. (AR 203). Dr. Bonilla added that Claimant's financial situation caused her stress and determined that her Global Assessment of Functioning ("GAF") was 70. (Id.). With respect to Claimant's ability to work, Dr. Bonilla concluded that Claimant was able to complete simple tasks but not carry out complex instructions. (Id.). Further, he opined that Claimant was capable of relating to and interacting with her coworkers, supervisors, and the general public. (Id.).

ALJ Ross concluded that the opinion of Dr. Bonilla should be accorded greater weight than the evaluations of Claimant 's CSPP treating interns, which were overseen by a licensed psychologist, in part because Dr. Bonilla was a psychiatric specialist. (AR 21-22). The ALJ also found that, because Dr. Bonilla opined that Claimant's emotional problems, treated solely with psychotropic medication, did not preclude her from performing simple, repetitive tasks, Claimant did not suffer a severe mental impairment. (AR 396). ALJ Ross further gave greater credit to Dr. Bonilla's opinion because Claimant was not fully compliant with her therapy sessions – generally attending only one counseling session per month and failing to appear at all for several months. (AR 21-22; compare AR 364 (Claimant  regularly attended her weekly sessions) with AR 481 (Claimant  attended 44 sessions between August 2002 and December 2004, which equates to less than two sessions per

1  month); see, e.g., 20 C.F.R. 416.930, Fair, 885 F.2d 603 (claimant's failure to comply with medical
2  care casts doubt on his complaints).

3     Because ALJ Ross outlined Claimant's medical history and provided adequate reasons, based
4  on substantial evidence, for according greater weight to the opinions of the examining consultants,
5  rather than accepting or deferring to, Claimant 's treating physician and psychological interns, the
6  undersigned finds that there was no error.

7  **II.   Claimant's Credibility**

8     Claimant  alleges that the ALJ does not provide the requisite findings for discounting her
9  testimony.  (Doc. 14, p. 22).  Specifically, she contends that the ALJ relied on the extent to which
10 Claimant  could perform daily activities and he not only misinterpreted and misconstrued how
11 limited she was with respect to the daily activities that she still can do, but also misunderstood her
12 daily activities report and her testimony as to those activities that she either cannot do at all or cannot
13 do when it is cold.  (Id. at 20-22).  Claimant  argues that the ALJ erroneously found that her
14 testimony regarding activities is both vague and unsupported by her medical records.  (Id. at 20-21).
15 Claimant  further implies that the ALJ improperly penalized her for attempting to lead a normal life,
16 rather than staying in the house and vegetating.  (Id. at 22).

17    A two step analysis applies at the administrative level when considering a claimant's subjective
18 credibility.  Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996).  First, the claimant must produce
19 objective medical evidence of an impairment and show that the impairment could reasonably be
20 expected to produce some degree of symptom.  Id. at 1281-1282.  Pursuant to SSR 96-7p, however,
21 the ALJ may not disregard the claimant's pain testimony only because there is a lack of medical
22 records evidencing an impairment that causes pain.  SSR 96-7p; Light v. Soc. Sec. Admin., 119 F.3d
23 789, 792 (9th Cir. 1997).  Nonetheless, if there is no evidence that the claimant is malingering, the
24 ALJ can reject the claimant's testimony about the severity of his or her symptoms "only by offering
25 specific, clear and convincing reasons for doing so."  Smolen, 80 F.3d at 1281.  This level of
26 specificity is crucial because, in its absence, effective judicial review may not be possible.  See
27 Mersman v. Halter, 161 F. Supp. 2d 1078, 1086 (N.D. Cal. 2001) ("The lack of specific, clear, and
28 convincing reasons why Claimant 's testimony is not credible renders it impossible for [the] Court to

19

1    determine whether the ALJ's conclusion is supported by substantial evidence"); SSR 96-7p (the

2    ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent

3    reviewers the weight the adjudicator gave to the individual's statements and reasons for that

4    weight").

5        Factors that the ALJ may consider in weighing a claimant's credibility are the claimant's

6    reputation for truthfulness; inconsistencies either in the claimant's testimony or between the

7    claimant's testimony and the claimant's conduct, daily activities, or work record; and testimony from

8    physicians and third parties concerning the nature, severity, and effect of the symptoms of which the

9    claimant complains.  Thomas, 278 F.3d 947, 958-959 (9th Cir. 2002).  Further, although the

10   inconsistency of objective findings with subjective claims may not be the sole reason for rejecting

11   subjective complaints of pain, Light, 119 F.3d at 792, it is one factor which may be considered with

12   others, Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Morgan v. Commissioner 169 F.3d

13   595, 600 (9th Cir. 1999).  This Court further notes that there are any number of clear and specific

14   findings that the ALJ can make, many of which are identified in SSR 96-7p.  Such findings include:

15   (1) whether "the level or frequency of treatment is inconsistent with the level of complaints," SSR

16   96-7p (Medical Treatment History), (2) whether "the medical reports or records show that the

17   individual is not following the treatment as prescribed and there are no good reasons for this failure,"

18   id., (3) the consistency of statements made by the claimant to physicians, to those deciding benefits

19   under other programs (e.g., workers' compensation), and to the Social Security Administration itself,

20   while recognizing that "[s]ymptoms may vary in their intensity, persistence, and functional effects, or

21   may worsen or improve with time, and [that] this may explain why the individual does not always

22   allege the same intensity, persistence, or functional effects of his or her symptoms."  Id.  Each of

23   these and other potential findings are fact-specific, precisely the province of the ALJ.

24       Some other ALJ findings, as identified in reported cases, are illustrative and demonstrate the

25   many ways in which ALJs can draw credibility inferences from the facts at hand: (1) an ALJ found

26   that claimant's testimony that her neck pain was so severe that she had to cut her long hair for relief

27   was contradicted by the fact that her hair reached well below her shoulders at the administrative

28   hearing, Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003), (2) the same ALJ found that

claimant's testimony that she had never undergone physical therapy was contradicted by medical records indicating that she had, in fact, attempted such treatments, id., (3) an ALJ found that claimant's "extremely poor work history" and low "propensity to work" negatively affected her credibility regarding her assertion that her disability precluded work, Thomas, 278 F.3d at 959, (4) the same ALJ found that claimant had not been a reliable historian, "presenting conflicting information about her drug and alcohol usage," id., (5) the same ALJ also found that claimant's efforts to impede accurate testing of her limitations argued strongly against her credibility, id., (6) an ALJ found that claimant had been uncooperative during consultative examinations, and illustrated that finding with a specific statement by a physician regarding claimant's "poor effort," Tonapetyan, 242 F.3d at 1148, (7) the same ALJ found that claimant tended to exaggerate, and illustrated that finding with a specific comment by a physician that claimant was deficient during cognitive testing but "much better" when giving reasons for her inability to work, id., (8) an ALJ found that claimant's pain assertions were inconsistent with the opinion of his own treating physician, who was "quite emphatic in his report about the lack of objective evidence to support claimant's complaints of pain and weakness," Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995), (9) an ALJ found that claimant's limited and recent use of non-narcotic pain medications were inconsistent with her claim of extreme pain, Ruiz v. Apfel, 24 F. Supp. 2d 1045, 1048-1049 (C.D. Cal. 1998), and (10) the same ALJ found that claimant's conservative treatment regimen was inconsistent with her complaints of extreme pain, id. at 1049.  For a brief synopsis of factors that can form a basis for ALJ credibility findings, see Light, 119 F.3d at 792 ("the ALJ may consider [claimant's] reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains").

ALJ Ross discounted Claimant's credibility due to discrepancies between the information that she told various doctors and inconsistencies between her reported daily activities and her testimony regarding her limitations.  (AR 397-398).  Specifically, the ALJ noted that Claimant told a psychological intern that her physical injuries included a shattered disc, but all of the radiological tests of her spine were normal.  (Id.; see AR 179-185, 367).  ALJ Ross further referenced Claimant's

having told her psychological intern that she had a long history of alcohol and drug use and had been hospitalized for mental health problems, while informing the examining consultants that she had no history of illicit drug use or psychiatric hospitalization.  (AR 388; compare AR 368-369 with AR 201-202, AR 248).

The ALJ also found that there were discrepancies between Claimant's subjective complaints and the activities that she purportedly did as reported in her Daily Activities Questionnaire ("DAQ").  (AR 388; see AR 132-134).  As noted by the ALJ, Claimant March 31, 2002 DAQ reveals that she walks, occasionally shops, prepares frozen meals and pop-open soups, and does some laundry, dusting, and dishwashing.  (AR 132-133).  The ALJ observed that, in October 2001, Claimant told consulting psychiatrist Bonilla that she engaged in some of these activities, but generally watched television.  (AR 388).  In contrast, Claimant testified that her pain was so severe that she could not stand or walk for any significant period of time and slept most of the day.  (See AR 514-521).

Finally, ALJ Ross found that Claimant's "present scenario" was identical to that identified in her earlier application, noting that Claimant was able to work when her previous application was denied.  (AR 388).  From this, the ALJ apparently inferred that, as before, Claimant exaggerated her pain and limitations.  See Mark v. Celebrezze, 348 F.2d 289, 293 (9th Cir. 1965) (holding that reasonable inferences and conclusions drawn from the evidence will be upheld).

The ALJ set forth sufficient, adequate reasons for discounting Claimant's subjective testimony, as discussed above.  See Light, 119 F.3d at 792 (inconsistencies between testimony and reported daily activities); Thomas, 278 F.3d at 959 (poor historian who provides conflicting information about drug or alcohol abuse); SSR 96-7p (the consistency of statements made by the claimant to physicians).  Contrary to Claimant 's assertion, there is no indication that the ALJ's finding is based on her failure to stay home and vegetate.  The undersigned, therefore, finds no error in the ALJ's discounting, in part, the credibility of Claimant's testimony.

**III.   Failure to Develop the Record**

A.   Failure to Order a Consult Regarding Claimant's Fibromyalgia

Claimant  contends that the ALJ was obligated to develop the record by ordering a rheumatology consultation in light of her fibromyalgia diagnosis because her treating physician,

22

Dr. Khaira, reported that an expert's opinion was necessary to ascertain whether Claimant did, in fact, suffer from fibromyalgia and he had not been able to find a rheumatologist who would accept her insurance. (Doc. 14, p. 23; see AR 458). Accordingly, the ALJ had a duty to further develop the record by ordering a consult at the Commissioner's expense, but he failed to comply with this obligation, thereby necessitating a remand. (Id.).

An ALJ's duty to develop the record further is triggered when there is ambiguous evidence or when "the record is inadequate to allow for proper evaluation of the evidence." Mayes, 276 F.3d at 459-460; Tonapetyan, 242 F.3d at 1150. This duty may require that the ALJ obtain additional information by, inter alia, contacting treating physicians, scheduling consultative examinations, or calling a medical expert. 20 C.F.R. §§ 416.912(e)-(f), 416.919a.

In the instant case, the administrative record before the ALJ was neither ambiguous nor inadequate to allow for proper evaluation of the evidence. There were ample records detailing Claimant's physical and mental impairments, and how the ailments adversely or, contrarily, failed to, affect her from working or engaging in daily activities. (See generally AR). As discussed in Section I, Dr. Khaira's mention of fibromyalgia in his treatment records was not supported by any of the tests performed to ascertain whether Claimant suffers from common symptoms associated with the disease, such as tender or trigger points. (See AR 20-21, 398). Moreover, although Dr. Khaira's opinion letter mentioned unsuccessful attempts to refer Claimant to a rheumatologist, his progress reports belie this statement. (See generally AR 296-298, 458, 500). Additionally, the ALJ's decision may be set aside due to his failure to develop the record if a claimant can demonstrate prejudice or unfairness as a result of said failure. Vidal v. Harris, 637 F.2d 710, 713 (9th Cir. 1991). Regarding the ALJ's duty to fully and fairly develop the record, the Ninth Circuit thus places the burden of proving prejudice or unfairness on the claimant. The undersigned finds that the ALJ was capable of rendering a proper decision without a rheumatology consult and that Claimant has not proven prejudice or unfairness.

### B. ALJ's Failure to Question Claimant Regarding her Past Relevant Work

Here, the essence of Claimant's argument is the ALJ failed to comply with the Appeals Council's remand order to the extent that the order directed the ALJ to ascertain the exertional level

at which she performed her driver job.  (Id. at 24).  Claimant asserts that, given that the Appeals

Council ordered the ALJ to further develop the record as to her past relevant work as a driver, the

ALJ was obligated to take and consider Claimant's testimony relevant to this matter.  (Id.).  In

addition, Claimant contends that the ALJ erroneously declined her request to testify at the July 21,

2005 supplemental hearing so that she could rebut the VE's testimony regarding the jobs that he

stated she was capable of performing.  (Id. at 25).

> The Ninth's Circuit's holding in Orn sets forth the proposition that the ALJ must comply

with the Social Security Rulings and relevant sections of the Code of Federal Regulations.  See

generally Orn v. Astrue, 495 F.3d 625 (9th Cir. 2007).  Section 416.1477 of Title 20 of the C.F.R.

states, in pertinent part,

> Case remanded by Appeals Council.

> (a) When the Appeals Council may remand a case. The Appeals Council may remand a case
> to an administrative law judge so that he or she may hold a hearing and issue a decision or a
> recommended decision. The Appeals Council may also remand a case in which additional
> evidence is needed or additional action by the administrative law judge is required.

> (b) Action by administrative law judge on remand. **The administrative law judge shall take
> any action that is ordered by the Appeals Council** and may take any additional action that
> is not inconsistent with the Appeals Council's remand order.

20 C.F.R. § 416.1477(a) and (b) (emphasis added).  See, e.g., Tauber v. Barnhart, 438 F.Supp.2d

1366, 1375-76 (N.D.Ga. 2006) (remanding the action, in part, to the agency because the ALJ did not

comply  with the Appeals Council's remand order).

> In the case sub judice, the Appeals Council directed the ALJ to

> Question the claimant about her past relevant work.  Then apply the guidelines in
> SSR 82-62 to determine whether the claimant can perform her past relevant work,
> making appropriate findings concerning the mental and physical demands of the past
> relevant work and comparing those demands with the claimant's residual functional
> capacity.  If the claimant cannot perform her past relevant work, then proceed to step
> 5 of the sequential evaluation.

(AR 410).

> Instead of following this mandate, the ALJ relied on Claimant's description of the tasks that

she performed as a driver, as described on page 5 of Claimant's July 19, 2001, Work History Report.

(AR 23, 120).  Because, however, the ALJ had a VE testify as to several other jobs that Claimant

could perform if she no longer retained the RFC to return to her past relevant job as a driver, ALJ

Ross's failure to adhere strictly to the first sentence of the above-quoted portion of the remand order is not reversible error.  (See Statement of Facts, above); Batson v. Commissioner of Soc. Sec., 359 F.3d 1190, 1197 (9th Cir. 2004) (finding an error harmless where it did not negate the validity of the ALJ's ultimate conclusion).

As to whether ALJ Ross erred in refusing to allow Claimant to testify at the July 2005 hearing, it is worth noting that this supplemental hearing was held solely for the purpose of enabling Claimant's attorney to question the VE.  (See AR 565).  Claimant formally requested that she be allowed to testify at this hearing.  (AR 454).  In response to the ALJ's inquiry as to the subject matter of her testimony and why it had not been raised before, Claimant stated that she wanted to further address her upper extremity limitations for the edification of the VE, who previously identified jobs that required her to use her arms.  (AR 455).  Claimant further stated that she wanted to take advantage of the opportunity to testify that was provided by the Appeals Council.  (Id.).  The ALJ replied that Claimant could have testified as to her limitations when the VE was present at the previous hearing, he was concerned that any new testimony may be tailored to the VE's earlier testimony and, accordingly, refused to permit her to testify at the supplemental hearing.  (AR 456).

Although the Claimant presents no legal basis for her argument, the undersigned observes that there is nothing in the medical records evidencing Claimant's upper extremity limitations.  (See generally AR; Sections I and II above).  Moreover, the remand order directs the ALJ to further discover and assess specific matters, enabling the ALJ to take whatever action he feels necessary in addition to that ordered.  (See AR 408-411).  The Appeals Council's order does not grant rights to the Claimant other than the right to a new decision.  (Id.).  In this matter, the remand order directs the ALJ to question Claimant – it does not provide for Claimant to choose to testify in an attempt to bolster her case, although it likely would have entitled Claimant's attorney to question her in the event that the ALJ had elicited her testimony at the hearing.  (AR 410).  Because Claimant presents no argument and she had no underlying right to testify, the undersigned finds that the ALJ did not err in refusing to grant Claimant's request to testify at the supplemental hearing.

///

///

**CONCLUSION**

      For the reasons discussed above, this Court finds no error in the ALJ's analysis, for which there was substantial evidence and the proper legal standards were applied.  Accordingly, this Court ORDERS:

      1.      That Plaintiff's Social Security complaint is DENIED;

      2.      That judgment is ENTERED for Defendant Michael J. Astrue and against Plaintiff Jeanette Rogers; and

      3.      That the Clerk of this Court is DIRECTED to close this case.


IT IS SO ORDERED.

Dated:  __**March 28, 2008**__                  ____**/s/ Theresa A. Goldner**____
                                                          UNITED STATES MAGISTRATE JUDGE